[Civ. No. 56467. Second Dist., Div. Five. Mar. 24, 1980.]

MARGARITA GARCIA et al.,
Plaintiffs and Respondents, v.
MARION P. WOODS, as Director, etc.,
Defendant and Appellant.

**COUNSEL**

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Floyd D. Shimomura, Deputy Attorney General, for Defendant and Appellant.

John E. McDermott, Patricia M. Tenoso, Marilyn Katz, Toby J. Rothschild, Neil J. Roberts, Marsha Lynn Jones, Adele M. Blong and Mary R. Mannix for Plaintiffs and Respondents.

## OPINION

**STEPHENS, J.**—Plaintiffs Margarita Garcia and Palmida Castanon represent themselves and a class of persons who are recipients of the aid to families with dependent children (AFDC).[1] They initiated the present action against the Director of the State Department of Benefit Payments (hereinafter Department),[2] challenging the validity of a Department regulation imposing a system of "prior month budgeting" in computing AFDC payments. The trial court denied plaintiffs the injunctive and declaratory relief which they sought and entered judgment for the defendant Department. Plaintiff appealed. This court in *Garcia v. Swoap* (1976) 63 Cal.App.3d 903 [134 Cal.Rptr. 137], held that the challenged regulation violated federal and state law governing the AFDC program.

---

[1]As summarized in *Shea* v. *Vialpando* (1974) 416 U.S. 251, 253 [40 L.Ed.2d 120, 125, 94 S.Ct. 1746]: "The AFDC program is designed to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them. A principal purpose of the program, as indicated by 42 U.S.C. § 601, is to help such parents and relatives 'to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection. . . .' The program 'is based on a scheme of cooperative federalism.' *King* v. *Smith*, 392 U.S. 309, 316 [20 L.Ed.2d 1118, 88 S.Ct. 2128] (1968). It is financed in large measure by the Federal Government on a matching-fund basis, and participating States must submit AFDC plans in conformity with the Act and the regulations promulgated thereunder by the Department of Health, Education, and Welfare (HEW). The program is, however, administered by the States, which are given broad discretion in determining both the standard of need and the level of benefits. See *Jefferson* v. *Hackney*, 406 U.S. 535, 541 [32 L.Ed.2d 285, 92 S.Ct. 1724] (1972); *Rosado* v. *Wyman*, 397 U.S. 397, 408-409 [25 L.Ed.2d 442, 90 S.Ct. 1207] (1970); *Dandridge* v. *Williams*, 397 U.S. 471, 478 [25 L.Ed.2d 491, 90 S.Ct. 1153] (1970); *King* v. *Smith, supra*, at 318-319 [20 L.Ed.2d 1118]."

The State of California enactment of the AFDC program is in Welfare and Institutions Code section 11200 et seq. Hereinafter, all code references will be to the Welfare and Institutions Code, unless otherwise indicated.

[2]The State Department of Benefit Payments has been succeeded by the State Department of Social Services. (Welf. & Inst. Code, § 10600.1.) Hence, Marion J. Woods, who is the current director of the latter Department, is now the real party in interest in this case. Nevertheless, as stated in text, defendant will be referred to as "Department."

The action was remanded to the trial court which subsequently rendered judgment for plaintiffs; the trial court also ordered the director of the Department to propose and promulgate regulations that would bring the state's budget system for computing aid payments into line with state and federal law as set forth in *Garcia.* The Department did draft proposed regulations. Plaintiffs, however, challenged the validity of those proposed regulations by means of a motion seeking an "Order to Show Cause in re Contempt," or, in the alternative, an order clarifying judgment. At the hearing upon the motions, the trial court rejected certain aspects of the proposed regulations, and later issued an "Order Modifying Judgment." That order stated that if the Department chose to retain a prior month budgeting system, it must then adopt the regulations as proposed, albeit with several required changes. On this appeal, the Department contests the trial court's order requiring those changes.

I

BACKGROUND

Since 1972 the Department has used a "prior month budgeting" (PMB) system in computing AFDC payments. The basic outlines of that system are succinctly described in a recent report prepared by the Department:[3] "Using Prior Month Budgeting, a recipient's grant reflects income received two months earlier. The budgeting process takes place over a three-month period—the budget month, the report month, and the payment month. In month one, the budget month, income is received by a family. This income or other change of circumstance is reported to the county welfare department at the beginning of month two, the report month. The recipient's aid payment for month three, the payment month, is determined according to the income received in the budget month and reported in the report month. This process continues month after month. Prior month budgeting cannot begin until the third month of aid so income received in the first two months must be estimated concurrently.[4] The same income is counted again in months three and four for prior month budgeting."

---

[3]A.F.D.C. Program Management Branch, State Department of Benefit Payments, Report of the Alternative Systems Work Group (Feb. 1977) page 6.

[4]Concurrent budgeting is the second major system for computing aid payments. Under this system, the grant payment for the current month is computed on the basis of an estimate of income to be received during that month. Because the grant payment is based upon an estimate of income rather than actual income, overpayments and under-

Because of the lapse of time between when the information is obtained and when a grant payment is issued, there is a "lag" between the month in which a change occurs and the month such change is reflected in the grant payment. So long as there is no income to be considered or the income does not fluctuate, PMB will generally have no adverse effect upon recipients of aid; the monthly aid payment will remain constant. As a result of the "lag," however, when recipient families receive sporadic income in one month and then suffer loss of income, they may experience hardship. The problem is clearly demonstrated in the cases of the two named plaintiffs—Margarita Garcia and Palmida Castanon.

The facts in those two situations were summarized in the *Garcia* decision (63 Cal.App.3d 903, 907 [134 Cal.Rptr. 137].) "Appellant Garcia and her four children received an AFDC check for $355 in July 1974. For the four preceding years, her only source of support was the AFDC program. In both June and July 1974, she received, in addition to the AFDC grant, $200 in child support from her ex-husband. No child support money was received in August or September. She reported the income to her caseworker on the two occasions that she received it, but claims that her caseworker never told her that the income would be used to lower her AFDC grant two months later. In August and September her AFDC grant was reduced to $155 to reflect her June and July income. Appellant Garcia had no other available income in August or September other than the AFDC grant since the child support payments received in June and July had been spent on past due bills.

"In July 1974, Mr. Castanon was residing with his wife and child and earned from part-time work net nonexempt income of approximately $250. Appellant Castanon declares that her husband spent all of the income in July by contributing $180 toward his father's funeral and the remainder on his own personal needs. In August, Mr. Castanon left his family and has not returned; appellant's grant was reduced to $86 to reflect Mr. Castanon's July income."

In *Garcia* v. *Swoap, supra*, at page 903, this court confronted the abovementioned problems wrought by PMB and held the regulation imposing that system to be invalid as currently constituted. The court

payments result. Such errors are corrected by means of "adjustments" in future grant payments. (*Id.*, Alternate Payment Systems Discussion Paper (Sept. 13, 1977.) p. 13.)

found that the regulation violated federal and state law requiring that AFDC payments reflect the current needs of aid recipients. (*Id.* at pp. 912-913.) The case was remanded to the trial court which ordered the Department to propose regulations that would establish a budgeting system not inconsistent with the law as articulated in *Garcia.*

The Department decided to retain but modify the prior month budgeting system rather than to convert to a concurrent month budgeting system. It pointed to language in the first *Garcia* decision which stated that the PMB system might be continued if the regulations were amended to provide mandatory supplemental payments to protect the children.[5] Although the old regulations did provide for supplemental payments in some circumstances, the provisions were purely discretionary in application, and therefore inadequate.[6] The Department proposed regulations which expanded the provision for supplemental payments.

The final proposed regulations[7] of the Department did make supplemental payments mandatory rather than discretionary; nevertheless,

[5]In the first *Garcia* decision, this court stated as follows: "In the case of sporadic income, Prior Month Budgeting can be viewed as a streamlined form of recoupment —struck down in *Weinberger, supra* [*National Welfare Rights Organization* v. *Weinberger* (D.D.C. 1974) 377 F.Supp. 861], in contravention to the fundamental policy of providing for the current needs of the dependent child, and in violation of the current AFDC recoupment regulation. (45 C.F.R. § 233.20(a)(12)(i).) In this respect, PMB also avoids the specific recoupment limitations set forth in Welfare and Institutions Code section 11004, which parallel the federal standards. Both federal and state recoupment provisions proscribe the reduction of a subsequent assistance payment in the amount of a prior overpayment unless the recipient has sufficient income or resources available to meet the current needs of the needy child. [Citations.] Subdivision (e) of section 11004 is clearly worded to protect the children in these situations, while regulation EAS 44.315.8 (fn. 11) is designed to alleviate the problem and is not mandatory. We emphasize this point because it is believed that Prior Month Budgeting is a helpful and, if properly applied, reasonable method for computing welfare grants. The *regulation* should be amended so as to provide payments to protect the children. If this were accomplished, the PMB system would then comply with federal regulations." (63 Cal.App.3d at pp. 911-912. Italics in original.)

[6]The former provision for supplemental payments, EAS 44.315.8, read as follows: "If unusual and unforeseen substantial changes in a recipient's income occur, a supplemental payment may be made when necessary to protect the welfare of the child(ren). Supplemental payments shall be limited in any month to the extent that the total grant, together with currently available income, does not exceed the allowable Maximum Aid.

"When a recipient receives a supplemental payment in more than one month, the total of such payments may not exceed the recipient's total net nonexempt income during the first and second months preceding a change in budgeting method used by the county; or during the first and second months for which aid payments are made." (See also fn. 5, *ante.*)

[7]The hearing upon plaintiffs' motion to seek orders to show cause or to clarify judgment occurred on April 21, May 12, and May 15, 1978. The proposed regulations

several other aspects of the regulations were considered by plaintiffs to be unacceptable.

Those regulations[8] distinguished between persons who commenced receiving aid while they were also receiving some other income and persons who commenced aid without such income. This distinction was based upon one of the characteristics of PMB: income received during

---

which were presented to the trial court on April 21, were different from those that were presented on May 12 and May 15.

On April 21 the trial court indicated that defendant's proposed regulations appeared to be inconsistent with this court's decision in *Garcia*. The court cited two basic concerns: (1) The regulations required that an "emergency" exist before a recipient would be entitled to a supplemental payment. The determination of whether an emergency existed involved an exercise of discretion; this appeared inconsistent with *Garcia* which had called for a system of mandatory, nondiscretionary payments. (2) The regulations provided that income and resources which were exempt for purposes of determining the eligibility for and amount of the monthly grant payment would not be exempt for purposes of determining the eligibility for and amount of a supplemental payment; this appeared to violate the policies which were the basis of those exemptions.

The hearing was continued until May 12, 1978. At that latter date, defendant abandoned the regulations reviewed on April 21 and substituted in their place new proposed regulations. It is the trial court's review of these latter proposed regulations that is contested on this appeal.

[8]Proposed regulation EAS 44-315.8, pertaining to supplemental payments was quoted in full in the trial court's order modifying judgment. The regulation, as quoted by the trial court, reads as follows: "44-315.8

".8 If a family budget unit receives or will receive less net nonexempt income in the payment period than was computed from the corresponding budget period, and the caretaker relative notifies the county of the decrease in income, the county shall inform the caretaker relative that a supplemental payment may be available and provide him or her with prescribed form. A supplemental payment shall be issued providing:

".81 The prescribed form has been completed by the caretaker relative in the payment period in which the decrease occurs or will occur; and

".82 either of the following occurs:

".821 if the recipient had net nonexempt income in the first two months of aid, the total of the current aid payment, the current net nonexempt income, and the 30-1/3 earned income exemption is less than the maximum aid payment for the family budget unit plus any recurring special needs allowance which the family is currently eligible for and receiving, or;

".822 If the recipient had no net nonexempt income in the first two months of aid or has received supplements equal to the amount of net nonexempt income received in the first two months of aid, the total of the current aid payment, current net nonexempt income, the 30-1/3 earned income exemption and any other liquid resources available in the payment period is less than the Minimum Basic Standard of Adequate Care (MBSAC) for the eligible children in the Family Budget Unit, plus any recurring eligible needs allowance which the family is currently eligible for and receiving.

".83 For purposes of this section, liquid resources means resources which are available and/or reasonably convertible to cash within the payment period.

".831 Liquid resources include cash, checking and savings accounts, negotiable securities, and all other income and liquid resources exempted or disregarded for purposes of eligibility and grant computation, subject to the limitations below.

the first two months of aid is counted twice, concurrently and prior month budgeted.[9] The Department's proposed regulations conceived of this "double counted income" as a kind of "bank" which was available to supplement recipients who suffered fluctuations or reductions of income. Persons who commenced aid with "double counted income" would be entitled to a supplemental payment whenever the current aid payment and income fall below the state maximum aid payment (MAP)—the state's schedule of aid payments for families according to the number of eligible persons.[10] (Welf. & Inst. Code, § 11450.) In such

".832 Liquid resources do not include the cash surrender value of insurance policies, trust deeds, household items and furnishings, personal effects, motor vehicles, real property, or such income or resources as are necessary to implement and continue an approval plan for rehabilitation or self-support. In addition, liquid resources do not include income or resources exempted for a specific purpose, e.g., relocation assistance benefits, or grants and loans which are exclusively for education purposes.

".84 Supplemental payments made under this section shall be an amount which:

".841 For supplements based on 44-315.821 above, when considered with the current aid payment, current net nonexempt income and the 30-1/3 earned income exemption equals the maximum aid payment for the family budget unit plus recurring special needs which the family is currently eligible for and receiving or,

".842 For supplements based on 44-315.822 above, when considered with the current aid payment, current net nonexempt income, the 30-1/3 earned income exemption and other liquid resources available during the payment period equals the Minimum Basic Standard of Adequate Care (MBSAC) for the eligible children in the Family Budget Unit, plus any recurring special needs which the family is currently eligible for and receiving.

".85 Such supplemental payment shall be issued promptly to AFDC families, but no later than three working days following the day the county receives the completed prescribed form.

".86 Limits on supplemental payments:

".861 The total amount of supplemental payments issued under 44-315.841 is limited to the amount of net nonexempt income received in the first two months of aid.

".862 There is no limit to the number of payment periods in which a Family Budget Unit may receive supplemental payment under 44-315.842.

".87 The County shall provide the recipient with a Notice of Action (ABCD 239) which specifies whether the request for a supplemental payment was granted or denied."

[9]As noted, under the prior month budgeting system, the payment for a given month is calculated by referring to the income of the recipient two months prior to when payment is made. Obviously, a problem arises in calculating the payment for the first two months of aid: there are no "prior months" of aid with which to calculate the payment. The current regulations solve this problem by figuring the payments for the first and second month by referring to the income received during those same months. The system becomes "adjusted" by the third month. The payment for the third month is calculated on the basis of the income received during the first month. (See fn. 4, *ante*.)

Thus, where a recipient begins aid at a time that she has some income, such income is counted twice—once in order to calculate the aid payment for each of the first two months of aid, and once again to calculate each of the third and fourth months of aid, respectively.

[10]Welfare and Institutions Code section 11450, subdivision (a), establishes the maximum aid payment for AFDC families. It reads in relevant part as follows: "(a) For

a case, a supplemental payment would be issued to bring the family up to the MAP. When an amount equal to the "double counted income" has been paid over in supplemental payments—the family's entitlement to supplemental payments would then be subject to those rules pertaining to families who commenced aid without income.

Those persons that began aid while they were not receiving other income would have no "double counted income." The proposed regulation therefore restricted the eligibility for an amount of supplementation for such families. Only the needs of the children—exclusive of the needs of the parents or providers—are protected. Such families would be entitled to a supplement whenever the current grant payment, current income, and available liquid resources fall below the minimum basic standard of adequate care (MBSAC) *of the children.* (See Welf. & Inst. Code, § 11452.)[11]

---

each needy family which includes one or more needy children qualified for aid under this chapter, there shall be paid, notwithstanding minimum basic standards of adequate care established by the department under Section 11452, an amount of aid each month which when added to his income, exclusive of any amounts considered exempt as income...is equal to the sums specified in the following table, as adjusted for cost-of-living increases or decreases pursuant to Section 11453:

| "Number of eligible needy persons in the same home | Maximum aid |
|---|---|
| 1 | $166 |
| 2 | 273 |
| 3 | 338 |
| 4 | 402 |
| 5 | 459 |
| 6 | 516 |
| 7 | 566 |
| 8 | 616 |
| 9 | 666 |
| 10 or more | 716" |

[11]Welfare and Institutions Code section 11452 is the legislatively determined schedule of minimum amounts of money necessary to sustain the basic and adequate subsistence of needy persons; it is based upon the number of eligible persons in the family.

The amounts indicated in the schedule for minimum basic standards of adequate care are not the amounts actually paid to AFDC recipients. The amount of payments is determined by the flat grant schedule—the MAP—in section 11450 (see fn. 10, *ante*). The maximum aid payments specified in section 11450 are somewhat less than the amounts stated in the minimum basic standards of adequate care.

Section 11452 reads as follows: "Minimum basic standards of adequate care shall be distributed to the counties and shall be binding upon them. Such standards are hereby determined on the basis of the schedule set forth in this section, as adjusted for cost-

Furthermore, the proposed regulation required that the Department —in determining eligibility and the amount of a supplemental payment —consider income and resources of the recipients which are ordinarily exempted from consideration in determining the aid payment. In the "non-double counted income situation" (where the recipient began receiving aid when no other income was coming in) the Department proposed to consider liquid resources such as cash, checking and savings account balances, and negotiable securities. In both the double and non-double counted income situations, the Department proposed to consider the first $30 and one-third of current income, which like liquid resources is ordinarily exempted.

On December 4, 1978, following a review of defendant's final proposed regulations, the trial court issued an order declaring that if the Department chose to retain a prior month budgeting system, it would be required to adopt those regulations as proposed, but with the following required changes: "(a) The '30 and 1/3' income, exempt in budget

---

of-living increases or decreases pursuant to Section 11453, which schedule is designed to insure:

"(1) Safe, healthful housing.

"(2) Minimum clothing for health and decency.

"(3) Low-cost adequate food budget meeting recommended dietary allowances of the National Research Council.

"(4) Utilities.

"(5) Other items including household operation, education and incidentals, recreation, personal needs, and insurance.

"(6) Allowance for essential medical, dental, or other remedial care to the extent not otherwise provided at public expense.

"...The schedule of minimum basic standards of adequate care is as follows:

| "Number of needy persons in the same family | Minimum basic standards of adequate care |
|---|---|
| 1 | $168 |
| 2 | 282 |
| 3 | 343 |
| 4 | 422 |
| 5 | 487 |
| 6 | 549 |
| 7 | 604 |
| 8 | 667 |
| 9 | 730 |
| 10 | 794" |

plus seven dollars ($7) for each additional needy person.

"The department shall establish rules and regulations assuring the uniform application statewide of the provisions of this section."

computations in order to provide a work incentive to recipients, shall not be added to the current aid payment and current net nonexempt income in determining eligibility for an amount of supplemental payments;

"(b) Liquid resources exempt from consideration in determining AFDC eligibility shall not be considered in determining either eligibility for or the amount of supplemental payments;

"(c) Supplemental payments to all recipients shall be in an amount sufficient to make the total nonexempt income of the family budget unit for the payment period equal to the Maximum Aid Payment for the family budget unit plus recurring special needs."

It is from this order by the trial court that defendant Department appeals.[12]

On May 4, 1979, new federal regulations pertaining to supplemental payments in the AFDC program became effective. (45 C.F.R. § 233.27.)[13] The regulations require states which use a "retrospective" (i.e., prior month) budgeting system providing for actual payment more than 25 days after the end of the budget month to issue supplemental payments to eligible recipients. (45 C.F.R. § 233.27(a).) A family is eligible if its income for the month is less than 80 percent of the amount that a state would pay a similar family without income. (45 C.F.R. § 233.27(a)(2).)

---

[12]In this decision we reach all three of the major issues raised by the order below. In addition to these, however, plaintiff-respondent points out many alleged flaws in the new regulation which would become manifest upon the occurrence of contingencies which she anticipates. We decline to deal with the myriad of conceivable flaws which may appear when the regulation is viewed in the abstract. It is appropriate that such alleged defects be contested on a case by case basis by aggrieved parties.

[13]Section 233.27 reads as follows: "(a) *General requirements*. A State plan which provides for payments between 25 and 45 days from the close of a budget month, shall provide for supplemental payments to eligible recipients who request them. A State plan which provides for payments within 25 days may provide for supplemental payments.

"(1) The supplemental payment shall be paid for the month in which it was requested.

"(2) The recipient family is eligible for a supplemental payment if its income for the month is less than 80 percent of the amount the State would pay for a similar family with no income. However, this percentage of the amount the State would pay for a similar family with no income may be set between 80 and 100 percent, as specified in the State plan. The supplemental payment equals the difference between the family's income in the payment month and that percentage.

The new regulation gave states several options in determining the eligibility for and the amount of a supplemental payment. First, states are permitted to provide supplemental payments in an amount that raises the level of a recipient family's funds to between 80 percent and 100 percent of what a similar family with no income would receive. (*Id.*) Second, states may consider the recipient family's ordinarily exempt liquid resources in determining eligibility and amount. (45 C.F.R. § 233.27(b)(2).) Third, states may also consider income which would be disregarded for purposes of figuring the ordinary assistance payment; the chief example of such disregarded income is the $30 and one-third income exemption mandated by Congress in 42 United States Code section 602(a)(8).

## II

THE TRIAL COURT WAS CORRECT IN REQUIRING SUPPLEMENTATION UP TO THE FULL AMOUNT OF AN AFDC FAMILY'S GRANT

A. *The needs of the entire AFDC family must be considered.*

In the revised regulations submitted to the trial court on May 12, 1978, the Department proposed a system of supplemental payments that would have assured that an AFDC family would have total available resources equal to the minimum basic standard of adequate care of the children.[14] It based this standard upon former section 11004, subdivision (e), now section 11004, subdivision (f). The trial court rejected this standard and ordered the Department to provide supplementation

---

"(3) Supplemental payments shall be issued within 5 working days of request.

"(b) *How income is treated.* For purposes of supplemental payments, income includes that month's assistance payment and any income received or expected to be received by the recipient, but does not include work-related expenses.

"(1) The amount used for the assistance payment shall be the monthly assistance payment without regard to any recoupments made for prior overpayments or adjustments for prior underpayments.

"(2) The agency may include as income cash in hand or available in bank accounts. It may also include as income any cash disregarded in determining need or the amount of the assistance payment, but not cash payments that are disregarded by paragraphs (c) on relocation assistance, (d) on educational grants or loans, (g) on payments for certain services and (l) on experimental housing allowances, of § 233.20(a)(4)(ii)."

[14]See footnote 11, *ante.*

in an amount that would make the AFDC family's available resources for the month equal to the maximum aid payment.[15] As explained below, the trial court did not err in so ruling.

The Department asserts that the *Garcia* decision supports its proposed regulation to supplement AFDC families only up to the needs of the children. It points to our analysis of Welfare and Institutions Code section 11004, subdivision (f), which provides for recoupment of overpayments.[16] We find this interpretation of *Garcia* wholly unpersuasive.

[15]See footnote 10, *ante*. The following table supplied by respondents, illustrates the two approaches at issue. The minimum basic standard of adequate care (MBSAC), the level of real need as defined in Welfare and Institutions Code section 11452 exceeds the maximum aid payment (MAP) for that same family size by an average of about 5 percent. The MBSAC for the *children* of the family alone, exclusive of the one or more caretakers in the family who are part of the family budget unit (FBU) for purposes of determining the MAP, is lower than the MAP for the family at all family sizes up to those including 8 or more children, a very small proportion of the recipient population. This assumes the FBU has only one member other than the children. However, FBUs frequently contain two or more persons in addition to the children, e.g., two parents, a mother and a grandmother, etc. In these cases, the supplement to the MBSAC for the children would be less than the MAP for *all* family sizes on the table below. The difference is most substantial where there are three or less children.

| Size of FBU | *Maximum Aid Payment (MAP) | *Minimum Basic Standard of Adequate Care (MBSAC) | MBSAC for Children | Difference (MAP for FBU Minus MBSAC for Children) |
|---|---|---|---|---|
| 1 | $201 | $204 | $— | $— |
| 2 | 331 | 342 | 204 | 127 |
| 3 | 410 | 416 | 342 | 68 |
| 4 | 487 | 511 | 416 | 71 |
| 5 | 556 | 590 | 511 | 45 |
| 6 | 625 | 665 | 590 | 35 |
| 7 | 686 | 732 | 665 | 23 |
| 8 | 747 | 808 | 732 | 15 |
| 9 | 807 | 885 | 808 | — |
| 10 or more | 868 | 962 | 885 | — |

*The table contains the latest MAP and MBSAC amounts, as adjusted by the Department for cost of living increases.

[16]Section 11004, subdivision (f), of the Welfare and Institutions Code reads in pertinent part as follows: "(f) Current grants may be reduced because of prior overpayments only if the recipient has income or resources available in the amount by which the county proposes to reduce payment; except that where evidence establishes that a recipient willfully withheld information about his income or resources, such income or resources may be considered in the determination of need to reduce the amount of the grant in current or future periods. Prior to effecting any reduction of current grants to recover prior overpayments, the recipient shall be advised of the proposed reduction and of his entitlement to a hearing on the propriety of the reduction...."

In our first *Garcia* decision, we analogized to the situation where a recipient receives an overpayment which may be recouped subject to the provisions of section 11004, to the situation where a recipient receives sporadic income in addition to her grant payment. We noted that in a prior month budgeting system, such sporadic income will not be reflected in the recipient's assistance payment for that month. In consequence, a kind of "overpayment" occurs. Such "overpayment" is automatically "recouped" two months later by means of a reduced grant payment. We then held that the statutory restrictions placed upon recoupment of overpayments pursuant to section 11004, subdivision (f), should apply to reductions of grant payments caused by the operation of a prior month budgeting system. (63 Cal.App.3d at pp. 911-912.)

■ We did not there discuss the distinction made in both federal and state recoupment provisions between overpayments that are obtained by accident and those obtained by a recipient's willful withholding of information. In fact, distinct rules apply to each of these two situations. If the overpayment is due to innocent causes, the Department cannot effect any recoupment unless income or resources are available in the amount of the proposed reduction. (45 C.F.R. § 233.20(a)(12)(i)(A)(1); Welf. & Inst. Code, § 11004, subd. (f); EAS 44-354.421b.) This means that any available income or resources are subtracted from the entire family's maximum aid payment; the Department cannot recoup from either the current assistance payment or the *nonexempt* income counted in the computation of the current assistant payment. (EAS 44-354.421(b); Administrator, Social and Rehabilitation Service, Dept. of Health, Education and Welfare, "Clarification of 45 C.F.R. 233.20(a)(12)(i)(A)(1)," Aug. 27, 1974.) Thus, where the overpayment is obtained honestly, the payment cannot be reduced to an amount which leaves the family with total available resources less than the maximum aid payment of the family.

Where the overpayment is obtained because a recipient willfully withheld information, the Department may reduce the aid payment to a greater extent. In recouping the overpayment, the Department may reduce the grant to an amount which leaves the family with only enough available resources to meet the current needs of the children, as defined by the minimum basic standards of adequate care. (Welf. & Inst. Code, § 11004, subd. (f); EAS 353.241(b).)

The Department's proposed regulation treats families who received a "prior overpayment" through the operation of PMB as persons who *will-*

*fully withheld information.* The Department seeks to justify this analogy on two bases. First, it asserts that the recipient who received sporadic income in addition to her normal grant payment should be deemed at fault if she failed to save the excess money until her payment was reduced two months later to reflect the previous income. Yet, such a view clashes with our *Garcia* decision, wherein we stated that an AFDC family must not be considered at fault for failing to retain the sporadically received excess funds. AFDC families who live at bare subsistance levels are not expected to budget sporadic income for a period of two months in the future. (63 Cal.App.3d at p. 913.) Thus, the first basis for the analogy is without merit. Secondly, the Department points to a portion of the *Garcia* decision in which we italicized a part of section 11004, subdivision (f), Welfare and Institutions Code, which sets the floor for willfully obtained overpayments. In emphasizing that provision, we intended only to focus upon the disparity between the protection given by section 11004, subdivision (f) and the complete lack of protection offered under the Department's PMB regulation. We in no way intended to analogize receivers of sporadic income to recipients who committed fraud to obtain overpayments. Such an interpretation profoundly departs from both the letter and the spirit of our decision and the statutory law it interprets.

In *Garcia*, we held that the primary flaw in prior month budgeting was that it provided for payments which were computed without consideration of the current needs of the recipients. (*Garcia* v. *Swoap, supra,* 63 Cal.App.3d 903, 913, 914; 45 C.F.R. § 233.20(a)(3)(viii); §§ 11450, 11004, Welf. & Inst. Code; 42 U.S.C. § 602(a)(7), (10).) Section 11450, subdivision (a), makes clear that the needs which must be considered are those of *all* eligible AFDC recipients in the family. Only when a recipient obtains an overpayment by willfully withholding information does California law authorize the Department to consider only the needs of the children. (Welf. & Inst. Code, § 11004, subd. (f).) No such facts exist in the present context.

Section 11450, subdivision (a), of the Welfare and Institutions Code requires in pertinent part: "For each *needy family* which includes one or more needy children qualified for aid under this chapter, there shall be paid...an amount of aid each month which when added to his income, exclusive of any amounts considered exempt as income...is equal to the sums specified in the following table...." (Italics added.) The obvious purpose of this statute is to assure that the needy family will have available each month a legislatively determined minimum

level of available resources with which to meet its needs.[17] As we recognized in *Garcia*, under prior month budgeting, a needy family may receive a monthly aid payment that falls far below the statutorily mandated minimum. In order to make a prior month budgeting system conform to section 11450 of the Welfare and Institutions Code, the Department must provide for supplemental payments which, when added to their other resources, raise the family to the minimum level specified in section 11450.

The Department cannot use the MBAC of the children as the proper standard. That standard is appropriate only in cases of *willfully* obtained overpayment. As the maximum aid table in section 11450 provides, the amount of aid payable depends upon the *"number of eligible needy persons in the same home."* The needs of *all* eligible needy persons in the household must be considered. ▇▇ Hence, the Department's proposed regulation providing for supplemental payments which fail to consider the needs of the needy eligible parents or caretakers thereby fails to make its prior month budgeting system conform to state or federal law.[18]

---

[17]We recognize that the flat grant payments were not intended to be adequate to meet the recipients' need level. (*Cooper* v. *Swoap* (1974) 11 Cal.3d 856, 866 [115 Cal. Rptr. 1, 524 P.2d 97].) Section 11452 of the Welfare and Institutions Code sets forth a schedule of minimum needs which exceed the flat grant payment of every corresponding family unit. Having built into the system a disparity between payment and need, "[t]he legislative scheme contemplates that families will find ways to save in one area to help less flexible expenses generated by another need item." (*Id.*) This inherent disparity between need level and maximum payment level makes it particularly important that the Department operate a budgeting system which does not aggravate the disparity by allowing monthly payments to fall below the appropriate MAP level during periods of changed circumstances.

[18]Even if we accepted the notion that only the current needs of the children—exclusive of the needs of the other members of the AFDC family—need be considered, we note that the Department's regulation fails to meet even that limited objective. The Department proposes a supplement that could bring the existing grant and income only up to the MBAC of the children. Although the supplement is sufficient to meet the children's needs, the adults obviously must live off the same payment. In consequence, neither the children nor the adults will have sufficient resources to meet their needs. This inevitable dilution of the children's interests cannot be justified where, as here, no legislatively recognized countervailing interest in deterring fraudulent conduct is applicable. (Cf. Welf. & Inst. Code, § 11004, subd. (f).)

Significantly, the Department initially rejected the proposed alternative of supplementing the children only up to the MBAC of the children. An internal Department study states that the proposal "was rejected because it ignores the fact that the adults will still live off the grant. In addition, supplementing up to this level would be contrary to the goal of meeting the current month's needs of the FBU [family budget unit]." (AFDC Program Management Branch, "Alternative Payment Systems" (Sept. 13, 1977) pp. 6-7.) The study also observed that the proposal might be inequitable be-

B.  *A PMB system that only provides for 80*
    *percent supplementation violates state*
    *AFDC law.*

The Department also asserts that the lower court's "Order Modifying Judgment" requiring full supplementation clashes with the new federal regulations adopted on May 8, 1979. Under the new federal regulations, states which, like California, provide that payments be made more than 25 days after the close of the budget month[19] must issue supplemental payments to eligible recipients who request them. (45 C.F.R. § 233.27 (a).) The regulation provides that a recipient family is eligible if its current month's income and aid payment are "less than 80 percent of the amount the State would pay for a similar family with no income." (45 C.F.R. § 233.27(a)(2).) The regulation also provides that a state plan *may* specify that supplementation be set between 80 and 100 percent of the amount the state would pay a similarly situated family without income. (*Id.*) The Department urges that, pursuant to the federal regulation, it may validly promulgate a regulation providing for 80 percent supplementation.[20]

We have concluded, however, that California law requires that a prior month budgeting system must provide for full supplementation up to the maximum aid payment. As previously stated, California has adopted a flat grant system that requires that each month a statutorily determined payment be made which reflects the family's current income and resources. (Welf. & Inst. Code, § 11450.) The obvious purpose of this scheme is to assure that the AFDC family will have a statutorily determined minimum level of resources each month with which to meet its needs. In order to render a prior month budgeting regulation consistent with this *state* requirement, the Department must provide for supplemental payments which, when considered with other available

---

cause of its harsher impact on small families. In a large family, the MBSAC amount for the children may exceed the full MAP amount for the family size. Smaller families, on the other hand, may receive amounts significantly lower for the family size. (See fn. 15, *ante.*) In spite of the inadequacies, the Department reconsidered the proposal and submitted it to the trial court on May 12, 1978. (See fn. 7, *ante.*)

[19]See text accompanying footnote 4, *ante.*

[20]We note one anomalous aspect of the above-mentioned provisions. An AFDC family that receives a payment which is 81 percent of what it would have received if *current* income had been considered in computing the current payment is not eligible for supplementation under the federal regulation. Yet, an AFDC family that receives 79 percent of what it would have received had current income been considered may receive supplementation up to 100 percent. There seems little reasonable basis for this disparity of protection against the vagaries of prior month budgeting.

resources, raise the family to the required level. In consequence, a Department regulation that sets eligibility for and the amount of a supplemental payment at only 80 percent of the required level thereby fails to rectify the shortcomings which led us to consider prior month budgeting invalid as constituted. This conclusion is based upon our interpretation of California's statutory scheme and is not affected by the federal regulation providing for minimum standards of supplementation.[21]

## III

THE TRIAL COURT ERRED WHEN IT RULED THAT THE "30 AND 1/3 INCOME EXEMPTION" APPLIED IN DETERMINING ELIGIBILITY FOR AND THE AMOUNT OF SUPPLEMENTATION.

The Department's next major contention on this appeal is that the trial court erred when it ordered the Department to make the following change if it chose to retain its "prior month budgeting" system: "(a) The '30 and 1/3 income,' exempt in budget computations in order to provide a work incentive to recipients, shall not be added to the current aid payment and current net nonexempt income in determining eligibility for an amount of supplemental payments. . . ."

In computing AFDC payments, the receipt of outside income generally causes a reduction in the amount of the aid payment. While most income is offset against the flat aid grant schedule (Welf. & Inst. Code, § 11450) on a dollar for dollar basis, federal law requires that an exception apply to a specific portion of earned income. Pursuant to 42 United States Code section 602(a), state AFDC programs are required, "in determining need" for assistance payments, to take into consideration any other income and resources "of any relative or child claiming aid," ex-

---

[21]The requirement discussed herein is based upon state law and exists without regard to the existence of matching federal funds. We nevertheless note that such a requirement does qualify for matching federal funds. Federal regulation section 233.20(b)(4) provides that federal participation is available for supplementation in a retrospective (i.e. prior month) budgeting system. Such "participation is provided when the amount of the supplemental payment, together with the monthly assistance payment and any [nonexempt] income. . .do not exceed the amount a state pays for a similar family with no income." In California, the amount paid to a similar family with no income is established by the flat grant schedule in section 11450. The supplementation requirements which we today conclude are required by state law seek only to raise the family up to the appropriate amount specified in section 11450 for similar families with no income. Hence, the requirements for matching federal funds are met.

cept that the plan must also "provide that, in making the determination [of need] under clause (7), the State agency—(A) shall with respect to any month disregard....(ii) in the case of earned income of...a relative receiving such aid...the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month...." ■ Essentially, this provision means that in computing an AFDC family's regular monthly assistance payment, a state is required to disregard the first $30 plus 1/3 of the remainder of the family's gross earned income. (42 U.S.C. § 602(a)(8); Welf. & Inst. Code, § 11008; EAS 44-111.23; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 739 [97 Cal.Rptr. 385, 488 P.2d 953].) Clearly the purpose of the earned income exemption is to encourage gainful employment. If each additional dollar earned through employment resulted in a dollar reduction of benefits, the recipient would be discouraged from seeking employment (*County of Alameda* v. *Carleson, supra,* 5 Cal.3d at 741, fn. 12; Report of the Sen. Finance Committee, Sen. Rep. No. 744, 90th Cong., 2d Sess. (1967) reprinted in 1967 U.S. Code Cong. & Admin. News, pp. 2982, 2994.)

Under the Department's proposed regulation, when the state determines eligibility for and the amount of a supplemental payment, it will consider *all* earned income—including the first $30 and 1/3 earned income generally disregarded when computing the normal grant payment. It must be emphasized that the $30 and 1/3 earned income which the Department's regulation proposes to count is current income, received during the same month in which the supplemental payment is sought.[22]

Plaintiff, in seeking our validation of the trial court order below, argues that "[i]f appellant [Department] is allowed to count the '30 and 1/3' income in computing supplemental payments, AFDC recipients will lose their work incentives. In effect their earnings will simply reduce their grants, dollar for dollar." It is asserted that this result is forbidden by Welfare and Institutions Code section 11008, which declares in part: "In order that recipients of public assistance may become self-supporting and productive members of their communities, it is essential that they be permitted to earn money without a proportionate deduction in their aid grants. It is the intention of the Legislature to

---

[22]If the Department proposed a regulation which directed that welfare authorities consider the $30 and 1/3 of income received in a *prior* month, such regulation would clearly violate the currency requirements of both state and federal law. (See *Garcia* v. *Swoap, supra,* 63 Cal.App.3d at p. 913.)

promote this objective and the department, in implementing public assistance laws, is directed to do so in the light of this objective." Moreover, section 11205, which sets forth the purposes of the AFDC program in California, provides "the employment and self-maintenance of parents of needy children shall be encouraged to the maximum extent and this chapter shall be administered in such a way that needy children and their parents will be encouraged and inspired to assist in their own maintenance." Plaintiff acknowledges that recently promulgated federal regulations do allow states to count the "30 and 1/3" income disregard in determining eligibility for or the amount of a supplemental payment. (45 C.F.R. § 233.27(b)(2).) Nevertheless, as plaintiff correctly urges, the regulations are permissive rather than mandatory. State laws, she asserts, require "specific...legislative authorization for including otherwise exempt income in calculating supplemental grant payments...." Without such authorization the Department has no authority to "invade such exempt income on the basis that such action is permitted by federal law."

We believe that the question whether the earned income exemption must be applied in the supplementation context is answered by determining whether the prior month budgeting system as currently constituted violates the earned income exemption provisions of federal and state law.[23] We have recognized that under prior month budgeting, a needy family may receive a monthly aid payment that falls far below the level that state law requires pursuant to section 11450. In order to make a prior month budgeting system conform to section 11450, the Department must provide a supplemental payment which when added to other resources raises the family to the minimum level. Yet, while prior month budgeting may impair the AFDC policy that current payments reflect current needs, it does not necessarily impair work incentive policies; a supplemental payment which is designed to protect one AFDC policy need not vindicate another policy which is already adequately protected.

[23]The applicability of the earned income disregard to the supplemental payment context really boils down to a question of federal—not state—law. Prior to 1971, section 11008 required that "to the maximum extent permitted by federal law, earned income of a recipient...shall not be considered income or resources of the recipient, and shall not be deducted from the amount of aid to which the recipient would otherwise be entitled." (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 742-743 [97 Cal.Rptr. 385, 488 P.2d 953].) Section 20.5 of the Welfare Reform Act amended section 11008 by removing the provision that earned income be disregarded "to the maximum extent *permitted by federal law*" and replaced it with a provision requiring that earned income be disregarded "[t]o the extent *required* by federal law." (Italics added.)

The $30 and 1/3 earned income exemption works basically as follows in the context of prior month budgeting. (EAS 44-111.23, —315.4,.6) Income is received in month "one." The first $30 and remaining 1/3 of gross income is exempted for purposes of determining the aid payment. The remaining "nonexempt" income is deducted from the flat grant amount specified in section 11450; the remaining amount constitutes the payment for month "three." Because the first $30 and 1/3 of income is retained by the recipient, and not deducted from her aid payment for month "three," such undeducted income constitutes an incentive to work. It places such recipients in a better position than similarly situated recipients who do not work.

In a prior month budgeting system there is a two-month lag between the budget month (when income is earned) and the payment month (when a payment is received which reflects the earned income exemption). We have previously discussed how the two-month lag between the budget month and the payment month can defeat basic AFDC policies by leaving the family with less resources than the minimum required by state or federal law with which to meet their needs. We have addressed that problem by requiring supplementation up to the MAP during periods of changed circumstances. Plaintiff, however, has failed to demonstrate that the two-month lag inherent in prior month budgeting has any significant negative affect upon the work incentive policy of 42 United States Code section 602(a)(8). Even during a period when a recipient's income is reduced we do not perceive that the recipient is discouraged from seeking or keeping employment because of the operation of PMB. On the contrary, such a time of reduced income is when the recipient is most encouraged to work in order to earn needed resources. Thus, we are not persuaded that prior month budgeting violates federal or state work incentive provisions.

It therefore appears to us to be bootstrapping to contend that the exemption must be applied not only when computing the normal assistance payment, but additionally when computing the supplemental payment. It is uncontested that the $30 and 1/3 of current income will be disregarded in computing the recipient's future aid payment; to again disregard the same $30 and 1/3 for purposes of computing a supplemental payment would be to double the effect of the exemption without any rational basis for doing so. Admittedly, if the $30 and 1/3 earned income disregard is not applied in determining eligibility for and the amount of a supplemental payment, some working recipients may be ineligible for supplemental payments, and others may receive smaller

supplements.[24] It in no way follows that the work incentive policy is thereby thwarted. The employee remains encouraged to keep her job because while she continues to work, $30 and 1/3 of her current income continues to be disregarded in figuring out future aid payments. If she quits, she will lose the advantage of the exemption.

█ In sum, we find plaintiff's argument unpersuasive because it is based upon a basic misapprehension concerning the nature of a supplemental payment. A supplemental payment is *not* a normal monthly aid payment for all purposes. Rather, it is designed specifically to correct the inability of PMB to respond to recipients' needs during a time when there is a loss of income. So long as work incentive policies are adequately vindicated under the normal functioning of the PMB system, there is no need to piggyback additional superfluous work incentives onto a supplemental payment system. The trial court erred, therefore, in ruling to the contrary.

## IV

█ THE TRIAL COURT WAS CORRECT WHEN IT RULED THAT "LIQUID RESOURCES" COULD NOT BE CONSIDERED IN CALCULATING SUPPLEMENTAL PAYMENTS

We turn next to appellant's contention that the trial court erred in ruling that "liquid resources" could not be considered in calculating supplemental payments. Subject to the caveat discussed below, we disagree.

In its December 4, 1978 "Order Modifying Judgment," the trial court ordered appellant to make the following change if it chose to retain its prior month budgeting system: "(b) Liquid resources exempt from consideration in determining AFDC eligibility shall not be considered in determining either eligibility for or the amount of supplemental payments...." In the revised regulations: ".831 Liquid resources include cash, checking and savings accounts, negotiable securities, and all other items and liquid resources exempted or disregarded for purposes of eligibility and grant computation, subject to...(certain) limitations...."

---

[24]It should be emphasized that under our holding in Part II of this decision, recipients who suffer a loss of outside income will be assured of having available resources equal to or greater than the MAP level specified in section 11450—notwithstanding that the earned income disregard is not extended to the supplementation context.

For the purposes of determining AFDC eligibility, an AFDC family may retain up to $600 in cash and securities. (§ 11257.) The effect of the trial court's order is to make this exemption applicable to calculation of supplemental payments.

In contesting the trial court's order, the department places heavy reliance upon the new federal regulations which *permit* a state to consider liquid resources in determining eligibility for and the amount of a supplemental payment. (45 C.F.R. § 233.27(b).) Nevertheless, since this federal regulation allows—but does not require—states to so consider liquid resources, the core issue thus becomes whether applicable state legislation authorizes the department to do so.

We believe that the impact of prior month budgeting upon the earned income disregard provisions differs materially from the impact of prior month budgeting upon the liquid resources exemption of section 11257. As we have observed, PMB does not disrupt the work incentive policy of the earned income disregard—even during a month in which the recipient undergoes a loss of income. It is true that the current payment may not reflect the recent loss of income. Nevertheless, the current payment does reflect the earned income exemption calculated from the corresponding budget month, two months previous. Furthermore, any current earned income is subjected to the exemption in computing the grant for the corresponding payment month, two months hence. Thus, prior month budgeting does not violate the earned income disregard provisions.

The situation is quite different with regard to the liquid resources exemption of section 11257. Section 11257 states in pertinent part: "No aid under this chapter (AFDC) shall be granted or paid for any child who has personal property, the total value of which exceeds six hundred dollars ($600)." Expressed in positive terms, the statute provides that aid shall be granted for otherwise eligible children notwithstanding that such recipients have personal property worth $600 or less. The clear intent of this statute is to describe the amount of personal property that a recipient of AFDC aid may retain and remain eligible to receive aid, if he is otherwise eligible for AFDC. (See the parallel property qualification provisions for categories of public assistance other than AFDC. § 11150 et seq.) The obvious rationale for allowing the recipients to retain and save up to $600 in personal property is to make aid available without forcing people to totally pauperize themselves to qualify for aid.

Under an unsupplemented prior month budgeting system, if a recipient family suffers a reduction of income, there is a two-month delay before the reduction is reflected in the aid payment; as a result of this delay, the payment fails to reflect current needs. Section 11450 is thereby violated. This failure to reflect current need in turn may force the family to expend any savings they might have in order to meet current needs. Section 11257 is also thereby violated because the family is forced to exhaust exempted property in consequence of the state's failure to provide the level of aid to which the family was entitled. If these liquid resources are expended, they will not, as a practical matter, be regathered later when the system adjusts to the new income level. No "excess" is later received which would allow the recipient to recoup the expended savings. The loss of the accumulated liquid resources is, therefore, probably permanent. We believe that such forced exhaustion of the recipient's accumulated personal property is one of the occurrences that section 11257 sought to prevent.

It follows that in order for a system of supplemental payments to rectify the previously discussed defects of prior month budgeting, such payments must be determined without reference to the recipient's liquid resources not in excess of $600. The failure of prior month budgeting to provide for current payments reflecting current financial status of recipients causes them to exhaust their personal property—property which section 11257 was enacted to allow them to retain. A system of supplemental payments is therefore necessary. Any supplemental payment regulation that in effect requires recipients to use up their liquid resources before they become eligible for supplemental payments thereby promotes one of the evils that section 11257 was designed to prevent. Such a regulation therefore fails to bring prior month budgeting into conformance with section 11257.

Our conclusion that liquid resources remain exempt in the determination of supplemental payments is subject to one caveat, applicable in the *sporadic income* situation. In our first *Garcia* decision, we held that the state could not apply a presumption that past income remains currently available. (63 Cal.App.3d at p. 913.) Sporadic income received in one month cannot be presumed to have been retained to offset the corresponding grant adjustment downward in the second following month. Thus, in Mrs. Garcia's case, the $200 of unexpected income received in June could not be presumed to have been retained to offset the $200 grant adjustment in August. Mrs. Garcia may be entitled to a supplemental payment even though she has spent the "prior overpayment."

A different situation prevails where Mrs. Garcia has actually *retained* the "prior overpayment." To the extent that the recipient has retained the sporadic income, prior month budgeting has in fact caused no injury. It is therefore reasonable and fair for the state to determine whether the income received in the prior month has been retained in a "liquid" form so that it is currently available for use. Thus if Mrs. Garcia saves the $200 in sporadic income received in June, it will appear in August as an available liquid resource. We hold that in determining eligibility for or the amount of a supplemental payment, the state may consider those liquid resources which are attributable to the "prior overpayment."

For the reasons stated, the order is affirmed in part and reversed in part. The cause is remanded and the trial court directed to enter its order in conformity with the views expressed herein.

Affirmed in part and reversed in part with directions.

Kaus, P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 17, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.